IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Tracey Bernard Gilyard and Tiffany Adams, | ) ) ) | C/A NO. 3:12-1336-CMC |
| Plaintiffs, | ) ) | **OPINION and ORDER** |
| v. | ) ) | |
| Randy Benson, individually, E. Shaw, individually, and Richland County Sheriff's Department, | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

This matter is before the court on Defendants' motion for summary judgment. ECF No. 66.

Plaintiffs have responded to Defendants' motion, and Defendants have filed a reply. Accordingly,

this matter is ripe for resolution. For the reasons noted below, Defendants' motion for summary

judgment as to the federal claims brought pursuant to 42 U.S.C. § 1983 is granted. Additionally, for

the reasons noted below, Plaintiffs' state law claims are dismissed with prejudice.

I. Amended Complaint

Plaintiffs filed suit in the Richland County Court of Common Pleas on April 13, 2012. On

May 21, 2012, Defendants Benson and Richland County Sheriff's Department removed this case

pursuant to 28 U.S.C. § 1331. On September 13, 2012, Plaintiffs amended their complaint to add

Defendant Shaw.

Plaintiffs assert claims for unreasonable seizure by use of excessive force and bystander

liability (as to Plaintiff Gilyard[1]) and three state law claims (assault and battery, negligence as to

---

[1]A plaintiff may not bring suit to vindicate the constitutional rights of a third party. *Miner v. Brackney*, 719 F.2d 954, 956 (8th Cir. 1983).

1

Richland County Sheriff's Department, and loss of consortium). The Amended Complaint does not specifically plead the constitutional provision under which Plaintiff Gilyard seeks to proceed. However, there is no question Gilyard's seizure occurred during the course of an arrest. Accordingly, Plaintiff Gilyard's federal claims are analyzed under the Fourth Amendment.

## II. FACTS

Taken in the light most favorable to Plaintiffs, the facts are as follows. In the early morning hours of August 3, 2011, Defendants Eric Shaw (Shaw) and Randy Benson (Benson) were on patrol duty as deputy sheriffs, employed by the Richland County Sheriff. At approximately 12:30 a.m., Shaw, suspicious of a vehicle departing an area known for drug distribution activity, initiated a traffic stop. Benson was patrolling in another vehicle, but was in the vicinity and joined Shaw in effecting the stop. The vehicle in question pulled off the roadway, into an area adjacent to the parking lot of a bar, H&J's Pub, and stopped. Shaw got out of his vehicle and approached the driver's side of the stopped vehicle; Benson got out of his patrol vehicle and approached the passenger side of the stopped vehicle in a "back up" capacity.[2]

Plaintiff Tracey Gilyard (Gilyard) was a patron of H&J's Pub. Gilyard departed H&J's Pub to retrieve cigarettes from his vehicle and was on the way back into H&J's Pub when "one of the officers called me, I guess, and I turned around to walk back to them . . . ." Depo. of Tracey Bernard Gilyard (hereinafter "Gilyard Depo.") at 42 (ECF No. 70-2). However, Gilyard then indicated that "I'm going to tell you, I don't know whether they called out to me or not." *Id*. at 44 (ECF No. 66-5). Gilyard testified that "[a]t that point in time, I was good and drunk by then, so I turned around as if

_____

[2]Another deputy sheriff, Deputy Oxendine, also arrived on the scene. Oxendine remained at the rear passenger area of the stopped vehicle, and there are no allegations presented by Plaintiffs relating to this third deputy.

I thought that the officer might have been talking to me, so I walked thataway [sic]. I took a couple of steps, and I stopped, and then that blank, gone." *Id*. at 44-45. Gilyard does not recall any other details of the incident, noting that "I was incoherent probably. I might have said something to them on the way out to my truck, but I don't remember. I might have cussed them out. I don't remember that." *Id*. at 46. Beyond the initial moments of the encounter, Gilyard testified that the next thing he remembers is waking up in the hospital. *Id*. at 50. Gilyard does not offer any evidence to contradict the officers' version of the events.[3]

Gilyard was approximately fifteen to twenty yards from the officers when he initiated contact by yelling, "Turn those damn lights off."[4] Depo. of Randy Benson (hereinafter "Benson Depo.") at 51 (ECF No. 66-3). Gilyard walked in the direction of the officers, still yelling. Benson, who was at the passenger window of Shaw's cruiser, yelled to Gilyard that he should "mind his damn business or he was going to jail." *Id*. Gilyard continued to walk toward him (Benson) and retorted: "I'll kick your ass!" *Id.* at 52.

Benson believed Gilyard's conduct (being loud and boisterous in a public place) constituted an officer safety issue because Gilyard was distracting the deputies' attention from the stopped vehicle and its occupant. Benson also believed Gilyard's statement "I'll kick your ass!" was a direct

---

[3]Attached to Defendants' Reply memorandum is a copy of the dashboard video from Deputy Shaw's cruiser. About five minutes after the traffic stop is initiated, Gilyard is heard yelling at the deputies, although a review of the audio portion of the recording does not establish what Gilyard was saying. *See* Exh. A to Reply (ECF No. 77-1). Accordingly, it is clear that officers did not initiate contact with Gilyard.

[4]As noted above, the audio portion of the recording does not establish what Gilyard was saying. *See* Exh. A to Reply (ECF No. 77-1).

threat to do him (Benson) bodily harm.  Accordingly, Benson decided to place Gilyard under arrest for Public Disorderly Conduct.

Benson thought at the time of the incident that Gilyard "appeared unsteady on his feet." *Id*. at 59.  However, neither Benson nor Shaw were aware, prior to Shaw's deployment of his taser, that Gilyard was (based upon Gilyard's own admission) inebriated. *Id*. at 58 ("After the incident, we did determine the odor of alcohol about his person.").

Benson turned and walked toward Gilyard, who "started walking away." *Id*. at 52.  Benson instructed Gilyard to stop and that he was under arrest.  Gilyard failed to comply, even as Benson repeated these instructions three to four times.[5]    On the audio portion of the dashboard video recording, Gilyard is heard saying, "For what?  No.  For what?"  According to Benson, Gilyard suddenly stopped walking, abruptly turned around, and assumed a "bladed stance," with his hands down by his side. *Id*. at 57; Depo. of Eric Shaw (hereinafter "Shaw Depo.") at 15 (ECF No. 66-4).  Benson clarified that a "bladed stance" means a stationary position where "you drop your non-dominant foot to the rear, taking a fighting stance."  Benson Depo. at 57.  Benson considered this action by Gilyard to be "active aggression." *Id*. at 103.

By now, Gilyard was approximately six to eight feet from Benson.  Benson told Gilyard to place his hands behind his back and that he was under arrest.  Gilyard refused.  Benson again repeated to Gilyard to turn around and put his hands behind his back or he (Benson) would deploy his taser device.  Gilyard did not comply with Benson's directive, but instead took two to three more steps towards Benson, and then stopped, with his body remaining in a "bladed" stance.  Shaw Depo. at 15.  After he took these steps, Gilyard was within five to six feet of Benson. *Id*. at 16.  Benson

---

[5]A review of the audio of the traffic stop confirms this fact.

removed his taser device from its holster, activated it, and aimed the target light at Gilyard's chest. Benson again directed Gilyard to place his hands behind his back or he would be tasered. Benson believed Gilyard was non-compliant with his commands. *Id*. at 102. Benson wrote in his incident report that Gilyard then responded, "Tase me!" See *id*.[6]

Benson pulled the taser's trigger, but the taser misfired. Gilyard had no reaction to these events and maintained his stationary "bladed" stance, with his body turned toward Benson.

As these events unfolded, Shaw heard Gilyard's initial shouting. Shaw heard Benson tell Gilyard that he was under arrest and the multiple directives given to Gilyard, including that he would be tasered if he did not put his hands behind his back. Acting as a cover officer, Shaw got out of his cruiser, walked behind the patrol vehicles, and positioned himself to Gilyard's rear.

Shaw saw Gilyard advance toward Benson, and saw Benson activate his taser and its misfire. Shaw testified that his role as backup or cover officer was to "step in and ensure that [Benson] [was] protected and make the arrest." Shaw Depo. at 18. Accordingly, Shaw drew his own taser gun and gave Gilyard a verbal direction to place his hands behind his back because he was under arrest. *See id*. at 17, 19. Gilyard did not turn to acknowledge Shaw, nor did he comply with Shaw's directive. Shaw then activated his taser. The taser's probes deployed into Gilyard's middle to upper back area. The activation period was a single burst lasting no more than five (5) seconds in duration.[7]

After being struck by the taser's probes, Gilyard fell backward, striking his head on the parking surface. Officers handcuffed Gilyard and called for an EMS unit. Deputies checked Gilyard's vital signs, and noted that he was breathing but otherwise unresponsive. Benson and Shaw

---

[6]The audio recording reveals that Gilyard said, "Stun me."

[7]This time period is confirmed by the audio on the video recording.

believed Gilyard was sleeping, as he was snoring.  See Benson Depo. at 70, 72; see also Shaw Depo. at 26-27.[8]  Benson and Shaw placed Gilyard in an upright position awaiting emergency assistance. Shaw then returned to his vehicle to complete the traffic stop.

Gilyard had stopped snoring and was responsive prior to the arrival of EMS, although Benson was not sure how long it took EMS to arrive.  Gilyard was thereafter taken to the hospital, where he was admitted with a subdural hematoma.[9]  He was discharged from the hospital the next day.  No records of Gilyard's stay in the hospital have been submitted.[10]  However, Plaintiffs' expert, Eleyna Ogburu-Ogbonnaya, M.D., read from the hospital's admissions report during his deposition, which noted Gilyard had a subdural hematoma, a blood alcohol content of "211," and that Gilyard was extremely intoxicated when he was examined in the emergency room, that he "refuse[d] to answer [ ] questions, instead answering with profanity," and "clearly smell[ed] of alcohol."  Depo. of Eleyna Ogburu-Ogbonnaya (hereinafter "Ogburu-Ogbonnaya Depo.") at 85, 86, 87 (ECF No. 72-1).  Gilyard was discharged from the hospital with directions to make a follow-up appointment with a neurosurgeon within a month, which he did not do.  Id. at 67.

In August 2012, over a year after the incident, after being referred by Plaintiffs' attorney, Dr. Ogburu-Ogbonnaya diagnosed Gilyard with Traumatic Brain Injury (TBI).  However, Dr. Ogburu-Ogbonnaya testified that he could not, within a reasonable degree of medical certainty, say that the brain injury was the major contributing cause to Gilyard's complaints, see id. at 109, as Gilyard has

---

[8]Gilyard can be heard snoring loudly on the audio track of the video recording.

[9]See Depo. of Eleyna Ogburu-Ogbonnaya, M.D. at 66 (ECF No. 72-1).

[10]The above-noted facts are taken from the deposition of Plaintiffs' expert, Eleyana Ogburu-Ogbonnaya, M.D.  See ECF No. 72-1.

diabetes, high blood pressure, smokes a pack of cigarettes a day, and has a history of stroke.  *See generally id.*

### III. STANDARDS

### A. SUMMARY JUDGMENT

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts."  *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Rule 56(c)(1) provides as follows:

(1)      A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

       (A)      citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers or other materials; or

       (b)      showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

7

A party "cannot create a genuine [dispute] through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985).  Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir. 1995).

## B. CONSTITUTIONAL CLAIMS

Gilyard's constitutional claims are two-fold.  Gilyard contends his seizure by Deputy Shaw was unreasonable under the Fourth Amendment; that is, that Shaw's deployment of his taser was an excessive use of force.  Additionally, Gilyard maintains Benson violated his constitutional rights when Benson "failed to attempt to prevent Defendant Shaw from using his taser on [Gilyard] . . . ." Amd. Compl. at 5.

The court must determine, in the light most favorable to Gilyard, whether Gilyard's seizure under the Fourth Amendment was "effectuated by excessive force." *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006).  A standard of objective reasonableness is applied, scrutinizing whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him. *Scott v. Harris*, 550 U.S. 372, 381 (2007); *Graham v. Connor*, 490 U.S. 386, 397 (1989).  In determining whether an officer's actions were objectively reasonable, the court weighs "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003).  "The nature of the intrusion on a Plaintiff's Fourth Amendment rights is generally measured by the amount of force employed to effect the seizure." *Turmon v. Jordan*, 405 F.3d 202, 207 (4th Cir. 2005) (internal citation omitted).  "The extent of the plaintiff's injuries is also a relevant consideration." *Buchanan*, 325 F.3d at 527.

8

In determining the governmental interests at stake, the court analyzes a non-exclusive list of factors, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, [and] whether he is actively resisting arrest or attempting to evade arrest by flight," *Graham*, 490 U.S. at 396. "Because 'police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving,' the facts must be evaluated from the perspective of a reasonable officer on the scene, and the use of hindsight must be avoided." *Waterman v. Batton*, 393 F.3d 471, 476-77 (4th Cir. 2005) (citing *Graham*, 490 U.S. at 396-97).

In an analysis of a Fourth Amendment claim, the subjective intent or motivation of the officer is irrelevant. *Graham*, 490 U.S. at 397. However, "[t]hough it focuses on the objective facts, the [ ] inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question." *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994). A reviewing court examines the totality of the circumstances, and "must focus on the moment that the force is employed[.]" *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011).

As to bystander liability, in *Randall v. Prince George's County, Md.*, 302 F.3d 188, 204 (4th Cir. 2002), the Fourth Circuit adopted a test for the evaluation of failure to act claims under § 1983. The court held that "an officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act."

### C.  QUALIFIED IMMUNITY

The Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), held that "[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. at 818.

Determining whether an official is entitled to qualified immunity generally requires a two-step inquiry. *See generally Pearson v. Callahan*, 555 U.S. 223 (2009).[11]  The court must determine whether, taken in the light most favorable to the plaintiff, the facts alleged show that the official's conduct violated a constitutional right. *Parrish*, 372 F.3d at 301-02.  If the facts, so viewed, do not establish a violation of a constitutional right, the inquiry ends, and the plaintiff cannot prevail.  *Id*. If the facts do establish such a violation, however, the court must determine whether the right violated was clearly established at the time of the alleged offense.  *Id*.  In determining whether the right violated was clearly established, the court defines the right "in light of the specific context of the case, not as a broad general proposition."  *Id*.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. "  *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "If the right was not clearly established in the specific context of the case –that is, if it was not clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted –then the law affords immunity from suit."  *Parrish*, 372 F.3d at 301-02 (citations and quotations omitted).

_____

[11]In *Saucier v. Katz*, 533 U.S. 194, 200 (2001), the Supreme Court held that the test for determining qualified immunity requires that the court make a two-step inquiry "in proper sequence."  In *Pearson*, however, the Court found that it is not necessary that the court review these steps in a particular order, as the inquiry process is left to the court's discretion.  *Pearson*, 555 U.S. at 236.  Thus, this court may first inquire whether the right allegedly violated was clearly established at the time of the alleged offense. *Id*.  If the right was not clearly established at the time of the alleged offense, then the court's inquiry need go no further.  *Pearson* "does not prevent the lower courts from following the *Saucier* procedure; it simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases." *Id*., 555 U.S. at 242.

"Fourth Circuit precedent is one source for determining whether the law was clearly established at the time of the alleged violation." *Vathekan v. Prince George's County*, 154 F.3d 173, 179 (4th Cir. 1998); *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999) (quoting *Jean v. Collins*, 155 F.3d 701, 709 (4th Cir.1998) (en banc)) ("In determining whether a right was clearly established at the time of the claimed violation, 'courts in this circuit [ordinarily] need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose . . . .'").

## IV. DISCUSSION

### A. *GRAHAM* ANALYSIS

The officers' versions of the events are undisputed – Gilyard does not remember the incident. The encounter occurred at approximately 12:40 a.m. in the parking lot of a bar in an area of town which was known to the officers as an area where drug trafficking occurred.  The deputies were actively engaged in a traffic stop, and as a result of Gilyard's activities, turned their attention from the car and individual involved in the traffic stop.[12]  The area was poorly lighted, as Shaw testified that after Benson's taser misfired, Shaw could not see whether Benson kept it in his hand because "[i]t was dark under there."  Shaw Depo. at 18.

Gilyard initiated contact by yelling at officers when he exited H&J's Pub.[13]  Gilyard continued to yell even after Benson told him to mind his own business or he would be arrested. Gilyard advanced toward the officers' location, and told Benson he would "kick his ass."

---

[12]There is no evidence (as confirmed by the video recording) that the driver of that vehicle interfered in any way with deputies when they turned their attention to Gilyard.

[13]Gilyard testified that officers may have initiated contact by calling him over; however, the audio portion of the dashboard camera recording indicates Gilyard initiated contact.

Benson approached Gilyard, telling him that he (Gilyard) was under arrest.  Gilyard was noncompliant with Benson's commands to submit to handcuffing.  Benson perceived Gilyard was "unsteady on his feet."

Shaw did not hear Gilyard's threat to Benson; he did hear Gilyard yelling and swearing. Shaw Depo. at 15.  Additionally, Shaw confirmed that instead of complying with Benson's directives, Gilyard assumed a stationary "bladed stance," with "his hands down to his side as if he was gonna fight." *Id*. at 15.  Shaw also indicated that Gilyard took two or three more steps toward Benson *after* he (Gilyard) had stopped and assumed the "bladed" position.

Gilyard's threat to Benson and his body stance led both officers to believe he was taking an aggressive position.  *See* Benson Depo. at 57 (describing Gilyard's stance as a "fighting stance"); Shaw Depo. at 15 ("He walked toward Benson with like his – his hands down to his side as if he was gonna fight.").  Additionally, Gilyard again advanced toward Benson by "two or three steps" and stopped within five to six feet of Benson.  There is no evidence that Gilyard was armed.

As noted above, Gilyard did not comply with Benson's directives.  Gilyard can be heard saying, "For what?  No.  For what?" in response to Benson's statements that he (Gilyard) was under arrest and to turn around and put his hands behind his back.  Gilyard turned to face Benson, stopped and took a "bladed stance,"  and then took a few more steps toward him (Benson).  After being told he would be tasered if he did not comply, Gilyard stated, "Stun me."

Shaw deployed his taser for a single, five-second burst.  After being struck by the taser's probes, it is undisputed Gilyard fell, hit his head, and was taken to the hospital.

As noted above, Gilyard was admitted to the hospital for an overnight stay, but no records of his stay in the hospital have been submitted.  It is not clear from the record why Gilyard was

12

admitted to the hospital. That is, it is not clear whether Gilyard was admitted solely because of his head injury or because of his "extreme" intoxication level, or some combination thereof. *See* Ogburu-Ogbonnaya Depo. at 87 (notes from examination in emergency room indicate that physician found Gilyard was "extremely ETOH [under the influence of alcohol]."). Additionally, a year after the incident, Dr. Ogburu-Ogbonnaya diagnosed Gilyard with TBI but could not, within a reasonable degree of medical certainty, say that the brain injury was the major contributing cause of Gilyard's complaints, *see* Ogburu-Ogbonnaya Depo. at 109, as Gilyard has diabetes, high blood pressure, smokes a pack of cigarettes a day, and has a history of stroke. *See generally* Ogburu-Ogbonnaya Depo. (ECF 72-1). Accordingly, it cannot definitively be determined to what extent Gilyard's later-reported problems were – or are – based upon the head injury suffered as a result of the incident.

### B. GILYARD'S ARGUMENTS

Gilyard's main argument is that alternative forms of force should have been used. Gilyard cites *Beaver v. City of Federal Way*, 507 F. Supp. 2d 1137, 1143 (W.D. Wash. 2007), for the proposition that "[t]he availability of alternate methods of capturing or subduing a suspect may be a factor to consider." Gilyard argues that because "back up" officers were present,

> instead of tasing the subject, one office[r] could cover the other officer while the first officer approached the subject and attempted to handcuff him. [ ] If the subject resisted, then the taser could have been fired if it was deemed safe or the back up officer could have simply moved in to provide manual assistance.

Memo. in Opp. at 9 (citing *Beaver*). However, while tasering a suspect "in general, is more than non-serious or trivial use of force," *Mattos v. Agarano*, 590 F.3d 1082, 1087 (9th Cir. 2010), Gilyard seeks to have this court apply 20/20 hindsight which the law rejects. "[T]he mere decision

13

itself to [deploy a taser weapon] as opposed to other alternatives affords no basis for liability" against Shaw. *Gandy v. Robey*, __ F. App'x __, 2013 WL 1339771 *7 (4th Cir. Apr. 4, 2013).

Gilyard also points to a disciplinary letter issued to Shaw in July 2010 regarding his use of a taser on another occasion to support the argument that Shaw's seizure of Gilyard involved excessive force. However, that situation was factually distinguishable from the circumstance of this case, as the suspect in the 2010 matter had interfered with a traffic stop, cursed Shaw, was "walking away," and then, at a distance from which he could not reasonably have hit Shaw, spit at Shaw. *See* ECF No. 71-9. Shaw then pursued him, directing him to stop, and deployed his taser.

As noted by Defendants, "[t]he task of [the] court is to put itself into the shoes of the officers *at the time the actions took place* and to ask whether the actions taken by the officers were objectively unreasonable." *Altman v. City of High Point, N.C.*, 330 F.3d 194, 205 (4th Cir. 2003) (emphasis added). The court "must focus on the moment that the force is employed[.]" *Henry*, 652 F.3d at 531.

### C. CONCLUSION – EXCESSIVE FORCE

Focusing on the moment the force was deployed, in light of the totality of the circumstances, Shaw's deployment of his taser device in this circumstance was not an unreasonable seizure in violation of the Fourth Amendment. It was late at night in an area of town known to be an area of drug trafficking and the area was poorly lighted. Shaw and Benson were confronted with an individual who was verbally combative and advancing towards them. When Gilyard stopped moving he was within five to six feet of Benson. Gilyard was not compliant with Benson's directions to turn around and place his hands behind his back. Additionally, Shaw saw Gilyard assume a body position that he (and Benson) considered to be aggressive in nature, and he observed Benson's taser misfire.

14

Prior to Benson's deployment of his taser, Gilyard stated, "Stun me." Shaw then initiated one, five-second burst of his taser gun, and Gilyard was thereafter brought under control. The fact that Gilyard was injured is undisputed, yet the extent of Gilyard's injuries is not clear. Gilyard was taken and admitted to the hospital after having hit his head on the parking surface. Yet he was also grossly intoxicated, responded to questions put to him by hospital personnel with "profanity," Ogburu-Ogbonnaya Depo. at 85, and was otherwise uncooperative with hospital personnel. *Id*. at 85-87. Gilyard was discharged from the hospital with directions to make a follow-up appointment with a neurosurgeon within a month, which he did not do. *Id*. at 67.

Gilyard's non-compliance with Benson's directives, his steps toward Benson, combative body stance, and response of "stun me" to Benson's taser warning are objective evidence that would lead a reasonable officer to believe force would be necessary to place handcuffs on Gilyard. Because Gilyard was refusing both officers' directives and the officers could have reasonably believed he did not intend to comply absent use of the taser, the court finds Defendants are entitled to summary judgment on Gilyard's federal excessive force claim as to Shaw and Gilyard's claim relating to bystander liability as to Benson.[14]

### D. QUALIFIED IMMUNITY

As Gilyard has not established a Fourth Amendment violation, the court need not reach the second prong of a qualified immunity analysis.

---

[14]Gilyard's claim for bystander liability as to Benson cannot survive as Gilyard has failed to establish a constitutional violation regarding Shaw's use of the taser.

## V. STATE LAW CLAIMS

Gilyard have asserted state law claims for assault and battery as to Defendants Shaw and Benson, negligence (as to Defendant Richland County Sheriff's Department), and loss of consortium. Defendants move for summary judgment, arguing that the cause of action for assault and battery fails and that Defendant Richland County Sheriff's Department (RCSD) is not a legal entity under South Carolina law and is therefore subject to dismissal. Neither side addresses Plaintiff Adams' cause of action for loss of consortium.

In their response to Defendants' summary judgment motion, Plaintiffs concede that "[a]fter examining Defendants' arguments relating to vicarious liability of RCSD and supervisor liability, Plaintiffs agree that these theories of recovery are not viable in this case." ECF No. 70 at 22. Accordingly, Gilyard's negligence cause of action against RCSD is dismissed with prejudice.

### A. ASSAULT AND BATTERY

Gilyard's remaining cause of action is for assault and battery. In South Carolina, assault and battery are separate claims. "A battery is the actual infliction of any unlawful, unauthorized violence on the person of another, irrespective of its degree; it is unnecessary that the contact be by a blow, as any forcible contact is sufficient; an assault occurs when a person has been placed in reasonable fear of bodily harm by the conduct of the defendant." *Gathers v. Harris Teeter Supermarket, Inc.*, 317 S.E. 2d 748, 754-55 (S.C. Ct. App. 1984).

Assuming, for purposes of this matter, that Shaw and Benson were not immune from liability under the Tort Claims Act,[15] Gilyard's claims for assault and battery fail as a matter of law. As to

---

[15]The South Carolina Tort Claims Act (the "Tort Claims Act"), S.C. Code Ann. § 15-78-10, *et seq.*, is the exclusive civil remedy for tort claims against a governmental entity. *See Flateau v. Harrelson*, 584 S.E.2d 413 (S.C. Ct.App. 2003). The Tort Claims Act allows an employer to be held

assault, Gilyard cannot recall any details of the incident.  Accordingly, Gilyard cannot prove that he was "placed in reasonable fear of bodily harm by the conduct of" Shaw or Benson.  *Gathers*, 317 S.E.2d at 755.

In South Carolina, an officer of the law may use force reasonably necessary to effect an arrest. *State v. Williams*, 624 S.E.2d 443, 446 (S.C. 2005).  As discussed above, Shaw's deployment of the taser was reasonable under the circumstances.  Accordingly, because the force used was reasonable under the circumstances, it was lawful under South Carolina law, and Plaintiff's battery claim fails.

Therefore, Defendants' motion for summary judgment on Gilyard's claims relating to assault and battery is granted and this cause of action is dismissed with prejudice.

### B. Loss of Consortium

Plaintiff Adams' loss of consortium claim is derivative of Gilyard's claims.  Therefore, as Gilyard has failed to establish a genuine issue of material fact as to the liability of Defendants Shaw and Benson, Adams' claim cannot survive.  Accordingly, Defendants Shaw and Benson are entitled to summary judgment and Plaintiff Adams' cause of action for loss of consortium is dismissed with prejudice.

---

liable for the torts of its employees acting within the scope of their employment. § 15-78-70. However, the Tort Claims Act does not extend immunity to employees "from suit and liability if it is proved that the employee's conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude."  S.C. Code § 15-78-70(b).  The court assumes, for purposes of this case, that an assault and/or battery are offenses involving an intent to harm which would strip Defendants Shaw and Benson of immunity.

## VI. Conclusion

Defendants' motion for summary judgment as to Gilyard's federal claims brought in this court pursuant to § 1983 and Gilyard's claims for assault and battery is **granted**, and these claims are dismissed with prejudice.

Defendant Richland County Sheriff's Department, Gilyard's claim for negligence, and Adams' claim for loss of consortium are **dismissed with prejudice**.

**IT IS SO ORDERED**.

s/ Cameron McGowan Currie
CAMERON McGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
October 2, 2013

18